UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| STEPHANIE LYNNE SKELTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:14-CV-143-RLW |
| | ) |
| CAROLYN COLVIN, | ) |
| ACTING COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Stephanie Lynne Skelton's ("Skelton") application for disability insurance benefits under Title II and Title XVI of the Social Security Act.

**I.    Background**

Skelton alleged that she had been disabled since April 15, 2011. (Tr. 11, 18, 114, 122). Skelton alleged disability based upon anxiety, bipolar disorder, and insomnia. (Tr. 15, 156). Skelton had past relevant work as an account clerk, receptionist, case aide, and customer-service representative. (Tr. 18, 48-51, 56).

The Social Security Administration ("SSA") denied Skelton's application for benefits and she filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). The SSA granted Skelton's request and a hearing was held on May 2, 2013. The ALJ issued a written decision on May 23, 2013, upholding the denial of benefits. (Tr. 8-19). Skelton filed a timely Request for Review of Hearing Decision with the Appeals Council (Tr. 7). The Appeals Council

denied Skelton's Request for Review. (Tr. 1-3). The decision of the ALJ thus stands as the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Skelton filed this appeal on October 13, 2014. (ECF No. 1). Skelton filed a Brief in Support of her Complaint on January 30, 2015. (ECF No. 14). The Commissioner filed a Brief in Support of the Answer on April 30, 2015. (ECF No. 19). Skelton did not file a reply brief within the time provided for under the Case Management Order.

## II. Decision of the ALJ

The ALJ found that Skelton had the following severe impairments: bipolar disorder and anxiety disorder. (Tr. 13). The ALJ, however, determined that Skelton did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 14-15). The ALJ found that Skelton had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple repetitive tasks, with only occasional interaction with the public, coworkers and supervisors. (Tr. 15-18). The ALJ gave the opinions of Skelton's primary care physician, Dr. Lori Moyers, little weight because they were inconsistent with the treatment notes and Skelton's activities of daily living. The ALJ based his finding of Skelton's RFC on his determination that Skelton was not entirely credible regarding the intensity, persistence and limiting effects of her symptoms. (Tr. 17). The ALJ noted that Skelton's course of treatment was limited and conservative since her alleged disability onset date. The ALJ also recognized that Skelton had received sporadic care, with large gaps in treatment, and that her activities of daily living (including babysitting and shopping) damaged her credibility. The ALJ found that Skelton was unable to perform her past relevant work. (Tr. 18). The ALJ also afforded little weight to the

2

opinion of state agency medical consultant Dr. Isenberg, who found Skelton suffered from a nonsevere anxiety disorder. The ALJ determined that, based on Skelton's RFC, jobs exist in significant numbers in the national economy that Skelton could perform. (Tr. 18-19). Consequently, the ALJ found that Skelton was not disabled. (Tr. 19).

### III. Administrative Record

The following is a summary of relevant evidence before the ALJ.

#### A. Hearing Testimony

Skelton testified on May 2, 2013, as follows:

Skelton is fifty-two. (Tr. 47). Skelton last worked in April 2011 for Electronic Billing Service in the accounting department. (Tr. 48, 50). She was fired from that job for performance issues. (Tr. 48). She previously worked at Walmart at the service desk and as a cashier. (Tr. 48). She worked for S.F. Andrew, a group home, in 1998 and 1999, and monitored the teenage girls that resided there. (Tr. 49). This position involved more standing than sitting and the most weight she was required to lift was 25 pounds. (Tr. 49). She worked for Falcon Cable CD, which is now Charter, as a customer service representative, working with customers over the telephone. (Tr. 49). She worked for Redford Truck taking work orders from truckers over the telephone; she did not deal with public. (Tr. 49-50). Skelton worked for Ballard General in 2011 as a cashier for about a month before she was terminated for performance issues. (Tr. 51).

Skelton never used street drugs or alcohol over the last several years. (Tr. 51).

Skelton's worst symptom is anxiety. (Tr. 51). She suffers from shaky hands, rapid heartbeat, sweating, tingling in hands and feet, dizziness. (Tr. 51). She feels like she is dying. (Tr. 51). She experiences these symptoms about 10-15 times on a weekly basis. (Tr. 52). She

3

has not had any improvement as a result of treatment over the years, and the symptoms seem to be getting worse as she gets older. (Tr. 52).

Skelton also suffers from bipolar disorder. (Tr. 52). Her bipolar disorder causes her to have manic episodes, where she can be obnoxious. Bipolar disorder also causes her to do things out of the ordinary, like spending a bunch of money. (Tr. 52). Skelton is currently taking Citrulline, Methionine, Hydroxyzine, Alprazolam, Xanax, and Lorazepam. (Tr. 52). Skelton states that sometimes these medications work well, but other times they do not. (Tr. 53). Skelton experiences side effects from these medications, including drowsiness and dry mouth. (Tr. 53).

Skelton lives with her father, who is 77. (Tr. 53). She drives rarely. (Tr. 53). She can go to the grocery store without incident but she has anxiety attacks if she drives for any extended time. (Tr. 54). She had a panic attack recently at a Cardinals game and spent the whole game in the bathroom. (Tr. 54).

Skelton does some household chores, including some laundry, as well as loading and unloading the dishwasher. (Tr. 54).

She could not work, even if the job did not require much interaction with other people, because her medication causes her to sleep frequently. (Tr. 55).

Skelton began living with her father a year and a half ago because she could no longer control her life. (Tr. 55, 56). She was hoarding, reckless with money, and not paying her bills. (Tr. 55-56). She would get upset and turn off her telephone for several days, which worried her father. For her safety and her dad's peace of mind, they decided that she should move in with him. (Tr. 55-56).

Vocational expert Ms. Sala testified as follows:

4

Ms. Sala classified Skelton's past work as an account clerk and as a receptionist as sedentary; and her past work as a case aide monitoring youth, a cashier and a customer service representative were considered light. (Tr. 56). Ms. Sala was asked to consider an individual of Skelton's age, education and work history, assuming light work involving repetitive tasks, with only occasional interaction with the public, coworkers and supervisors. (Tr. 56-57). Ms. Sala testified that such a person could not perform any of Skelton's past relevant work, but could do the "vast majority" of unskilled light work. (Tr. 56-57). In the second hypothetical, Ms. Sala was asked to assume the same person, but that the person could only work six out of eight hours a day and would be absent one day a week. Ms. Sala determined that such a person could not sustain competitive employment. (Tr. 57). Finally, Ms. Sala was asked to assume that the individual had an inability to sustain work-like procedures for eight hours a day. (Tr. 57-58). Ms. Sala found that such a person could not do any unskilled work.

**B. Medical Records**

Skelton's relevant medical records are summarized as follows:

On April 21, 2010, Skelton was seen by Dr. Moyers for refills on medications. (Tr. 202-03). She was diagnosed with insomnia. On June 11, 2010, Skelton was seen by Dr. Moyers with complaints of pain her joints, occasional insomnia, and the "stomach bug." (Tr. 205-07). On July 30, 2010, Skelton was seen by Dr. Moyers for a follow up on her low-back pain and insomnia. (Tr. 208-10). Skelton reported that her back pain was better with medication, but she still had pain with physical activity. On September 17, 2010, Skelton was seen by Dr. Moyers with complaints of insomnia, pain in joints, and anxiety. (Tr. 211-13). She obtained refills on her medications. On October 25, 2010, Skelton complained to Dr. Moyers of pain in her joints, lower back pain, and occasional insomnia. (Tr. 214-16). On November 30, 2010, Skelton saw

5

Dr. Moyers with complaints of allergy symptoms, ears aching, and occasional insomnia. (Tr. 217-19). On January 11, 2011, Skelton saw Dr. Moyers for a blood pressure evaluation, as well as complaints of occasional insomnia and tenderness in both ears. (Tr. 220-222). On February 28, 2011, Skelton was seen by Dr. Moyers regarding pain in her joints and anxiety. (Tr. 223-25). On April 8, 2011, Skelton was seen by Dr. Moyers for joint pain, chronic back pain, and occasional insomnia. (Tr. 226-28). On May 23, 2011, Skelton was seen by Dr. Moyers for a blood pressure evaluation and for complaints of occasional insomnia, anxiety, and stress. (Tr. 229-31). On August 30, 2011, Skelton saw Dr. Moyers and complained of insomnia and joint pain and indicated that she was there for refills of her medication. (Tr. 232-34). On November 11, 2011, Skelton was seen by Dr. Moyers with complaints of occasional insomnia, pain in joints, headaches, nasal congestion, and to refill prescriptions. (Tr. 235-37). For all of these visits with Dr. Moyers, Dr. Moyers indicated that she answered Skelton's questions regarding her treatment plan, provided refills, and told Skelton to follow up in 3 months.

On January 25, 2012, Skelton was seen by Dr. Moyers for follow up and prescription refills. (Tr. 238-40; 286-89).[1] Skelton indicated that she was considering only applying for disability benefits because anxiety had kept her from being able to maintain employment. She was taking lithium for her bipolar disorder. Her father was supporting her financially. Dr. Moyers gave Skelton refills on her medication.

On March 16, 2012, Dr. Isenberg, a State agency physician, reviewed the records and offered his opinion that Skelton's statements were considered partially credible because they were not all fully supported by the medical records. (Tr. 64). Ultimately, Dr. Isenberg determined that Skelton suffered from a not severe anxiety disorder. (Tr. 64).

---

[1] The record consists of treatments notes for nineteen (19) visits with Dr. Moyers. (Tr. 178-240, 286-305).

6

On April 6, 2012, Skelton was seen by Dr. Moyers for follow up on her pain and anxiety. (Tr. 290-92). Skelton indicated that her medications helped with both of those problems.

On May 24, 2012, Skelton was seen for intake history by John Anderson, clinical therapist at Community Counseling Center with complaints of feeling down and useless and having panic attacks. (Tr. 278-80). She was diagnosed with a GAF of 53. (Tr. 280).

On May 25, 2012, Skelton was seen by Dr. Moyers for follow up on her bipolar disorder, insomnia, and to fill out disability paperwork. (Tr. 293-94). Dr. Moyers also filled out a Medical Source Statement, in which she stated that Skelton had been unemployable since 2009 "secondary to psychiatric issues." (Tr. 251-55). Dr. Moyers further stated that Skelton was currently unable to maintain and handle finances, and was living with her father due to her inability to maintain independent living. Dr. Moyers said that Skelton suffered from marked restriction of activities of daily living and had extreme difficulty in maintaining social functioning. (Tr. 252).

On June 25, 2012, Skelton returned to see Dr. Moyers for prescription refills and for a health evaluation. (Tr. 295-96). On September 10, 2012, Skelton was seen by Dr. Moyers regarding her chronic back pain and her anxiety. (Tr. 297-298). Skelton indicated that medication helped with both of these issues. On November 26, 2012, Skelton was seen by Dr. Moyers for follow up for chronic back pain and anxiety. (Tr. 299-300). Skelton stated that she is taking her medication as prescribed and it helps with both of these conditions.

On August 8, 2012, Skelton saw Courtney Johnson, M.D. at the Community Counseling Center, complaining that she is bipolar. (Tr. 273-77). Skelton states that her last manic episode was about two and a half months ago, in the context of non-compliance with Lithium. (Tr. 273). She denied any history of suicide attempts or psychiatric admissions. She noted having episodes

7

of elevated mood, accompanied by excessive spending, decreased need for sleep, increased goal directed behavior, hyper-talkativeness, racing thoughts, and hyper-sexuality. (Tr. 273). Skelton reported that she began experiencing increased anxiety at the age of eighteen, accompanied by a fear of death, diaphoresis, and shortness of breath, chest pain, and lightheadedness. (Tr. 274). Skelton claimed that she would not go anywhere by herself because of a fear of having a panic attack and she would only drive if someone else was in the car. Her last panic attack was a week and a half prior to the evaluation. Dr. Johnson diagnosed Skelton with Bipolar II Disorder—in remission, panic disorder with agoraphobia—in partial remission. Dr. Johnson also feared possible benzodiazepine abuse. (Tr. 276). Dr. Johnson's treatment plan for Skelton included continuing Lithium, Hydroxyzine, Xanax, and Flurazepam. (Tr. 276-77).

On September 19, 2012, Skelton was seen by Dr. Johnson for medication management and therapy. (Tr. 271). Skelton was diagnosed with Skelton with Bipolar II Disorder, Panic Disorder with Agoraphobia, in partial remission, chronic mental illness, and severe occupational problems. She was assigned a GAF of 51.

On October 18, 2012, Dr. Johnson again saw Skelton for medication management and therapy. (Tr. 269-70). Dr. Johnson diagnosed Skelton with Bipolar II Disorder, Panic Disorder with Agoraphobia, in partial remission, and severe occupational problems. She was assigned a GAF of 51-60.

On February 11, 2013, Skelton was seen by Dr. Moyers with complaints of back pain, anxiety and insomnia. (Tr. 301-02). Skelton requested prescription refills for all of these problems. On March 26, 2013, Skelton was seen by Dr. Moyers for a follow up on her chronic back pain, anxiety, and insomnia. (Tr. 303-05). Skelton indicated that the medications were working well for all of her problems and requested refills of her prescriptions.

8

Also on March 26, 2013, Dr. Moyers filled out another Medical Source Statement in which she again stated that Skelton suffers from bipolar depression and has not been able to work since 2009 "secondary to psychiatric issues." (Tr. 281-84).

## IV.   Legal Standard

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities ... ." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[2] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008); *see also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id.*; *see also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove

---

[2] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

disability, however, remains with the claimant." *Id.*; *see also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

## V. Discussion

### A. Credibility/Decision Supported By Substantial Evidence

Skelton claims that the ALJ improperly determined that Skelton was not credible and erred in failing to give her statements weight when determining her RFC. (ECF No. 14 at 9-10).

11

The Court, however, finds that the ALJ properly discounted Skelton's testimony because she was not credible and properly accounted for Skelton's restrictions in formulating Skelton's RFC.

"Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001). "The duty of deciding questions of fact, including the credibility of [Skelton's] subjective testimony, rests with the Commissioner." *Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." *Gregg*, 354 F.3d at 714 (citing *Russell v. Sullivan*, 950 F.2d 542, 545 (8th Cir. 1991)).

The ALJ cited to evidence that when Skelton complied with treatment then it worked to improve her mental health. For example, mental status examinations routinely showed a normal mental status. (Tr. 16-17, 226-240, 256-80, 286-305). Likewise, Skelton regularly advised her medical providers that she had no adverse effects from her medications and her symptoms were stable and well-controlled with medication. (Tr. 16-17, 226-40, 2546-80, 286-305). Therefore, the ALJ properly considered the degree to which Skelton's treatment worked in order to reduce her anxiety symptoms to where she was able to perform substantial gainful activity. *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) ("As is often true in disability cases, the question was not whether Hogan was experiencing pain, but rather the severity of her pain.").

In addition, the ALJ considered that providers recommended conservative treatment and that Skelton's mental healthcare was sporadic and had large gaps in treatment. (Tr. 17, 226-40, 256-80, 286-305). Skelton has alleged an onset date of April 2011, but she failed to seek counseling until May 2012, and did not seek the care of a psychiatrist until August 2012. (Tr. 17, 251-55, 278-80). In fact, during her testament with Dr. Moyer, she appeared for limited

12

treatment and medication refills. Medications effectively controlled her symptoms and her mental-status examinations were benign overall. (Tr. 17, 18, 226-40, 256-80, 286-305). Her providers rejected in-patient treatment and left Skelton to determine her medications and dosage. (Tr. 256-80).

The Court also finds that the ALJ properly considered Skelton's activities of daily living and the supporting medical evaluations to evaluate Skelton's credibility and determine her RFC. During the pendency of her application for benefits, Skeleton stated she independently performed activities of daily living, lived alone, and lived with her father. (Tr. 14, 16, 17, 18, 53, 69). Skelton reported that she could take care of all her personal needs and was independent in all areas of daily living and that she visited others, *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)(citing *Reynolds v. Chater*, 82 F.3d 254, 258 (8th Cir. 1996)("Although specific articulation of credibility findings is preferable, [the Court] consider[s] the lack thereof to constitute a deficiency in opinion-writing that does not require reversal because the ultimate finding is supported by substantial evidence in the record."). She could do laundry, drive, and even babysit. (Tr. 16, 17, 69, 260-61, 271).

The ALJ also noted that Skelton's testimony that she suffered panic attacks 10-15 times per week varied significantly from the medical evidence. (Tr. 15-17).[3] Contrary to her testimony, Skelton rarely reported panic attacked and, when she reported panic attacks, they occurred at significantly less frequent intervals. (Tr. 15-17, 52, 54, 226-40, 256-80, 286, 305). In May 2012, Skelton reported that she "sometimes" has panic attacks. (Tr. 16, 278). On the

---

[3] Skelton argued that the ALJ misinterpreted Skelton's testimony and improperly stated that Skelton testified that she had 10-15 panic attacks per week. (ECF No. 14 at 9; Tr. 16-17). However, it appears that the ALJ properly characterized her testimony of symptoms such as shaky hands, rapid heartbeat, tingling hands and feet, dizziness, and a dying feeling (Tr. 15, 51) as panic attacks. Skelton described these same symptoms as a panic attack to Dr. Johnson. (Tr. 268-69).

13

three other occasions when she reported panic attacks, she indicated that the attacks occurred between one and a half weeks to three weeks prior. (Tr. 16-17, 268-69, 274). Importantly, on August 8, 2012, Dr. Johnson concluded that Skelton's panic disorder was in partial remission. (Tr. 17, 276). Skelton reported that her medication was working well and controlled her anxiety symptoms and she mostly denied having any recent panic attacks. (Tr. 226-240, 256-80, 286-305). Therefore, the Court holds that the ALJ properly rejected Skelton's testimony that she had 10-15 panic attacks per week. (Tr. 15-17, 52, 54, 268, 269).

Based upon the above analysis, the Court finds that the ALJ properly performed a credibility analysis regarding Skelton's complaints and that the ALJ's determination that Skelton was not disabled is supported by substantial evidence in the record. The Court finds that the ALJ appropriately fashioned the RFC to Skelton's limitations based upon the whole record. *Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946) ("Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."). The ALJ sufficiently summarized the evidence, including Skelton's testimony, her treatment history, and the medical opinions, that allowed him to make an informed decision regarding Skelton's ability to perform work. In sum, the Court finds that the ALJ properly evaluated and considered the evidence in determining Skelton credibility and RFC and that the ALJ's decision is supported by the evidence.

### B. Treating Physician

Skelton argues that the ALJ gave little weight to the opinions of her treating physician, Dr. Moyers, regarding "her ability to work limitations related to her psychiatric state because of his doubts as to the credibility of" Skelton. (ECF No. 14 at 11).

"Generally, [a] treating physician's opinion is due controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004). However, "[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir.2005) (internal quotation omitted); *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010).

First, the ALJ considered Skelton's primary physician Dr. Moyers' medical records. The Court finds that the ALJ properly gave little weight to Dr. Moyers' medical evaluations because of the lack of an explanation in the record for the recommendation and because it conflicted with the contemporaneous medical records. *See* 20 C.F.R. §404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). At every appointment, Skelton's mental-status examinations were normal. (Tr. 18, 226-40, 286-305). Skelton did not report any adverse effects from her medication and indicated that her mental impairments were controlled with medication. (Tr. 17, 226-40, 256-80, 286-305). The Court believes that the ALJ correctly found that Dr. Moyers' opinion in her medical evaluations was inconsistent with the medical record, including Dr. Moyers' own notes. Dr. Moyers acknowledged that Skelton's anxiety and other mental health issues responded well to medication. In fact, on several occasions, Skelton indicated that she was taking her anxiety medication as prescribed, that the medication was working, and that she was only seeing Dr. Moyers for prescription refills. Thus, the medical record supports a finding that Skelton's anxiety symptoms could be and were

controllable with treatment. The ALJ concluded that Dr. Moyers' opinions relied on Skelton's subjective report rather than the objective medical evidence. (Tr. 17, 293-94, 303). *See Whitman v. Colvin*, 762 F.3d 701, 706 (8th Cir. 2014) (ALJ properly considered claimant's relative lack of medical care as relevant when considering claimant's allegations of unbearable pain).

As previously discussed, the Court also agrees with the ALJ's determination that Dr. Moyers' statements regarding Skelton's limitations were contradicted by Moyers' own statements regarding her activities of daily living. (Tr. 14, 16-18, 251-55, 281-85). *See Whitman*, 762 F.3d at 706 (ALJ reasonably stated he discounted physician's opinion because the opinion was "more restrictive than self-reported activities"). Finally, The Court finds no error in the ALJ's consideration of Dr. Moyers' opinion and decision to afford it little weight.

Finally, the Court holds that, contrary to Skelton's argument, the ALJ may discount a treating physician's opinion regardless of whether the record contains the opinion of another physician. *Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) ("The ALJ may reject the opinion of any medical expert where it is inconsistent with the medical record as a whole."). "But a lack of medical evidence *to support a doctor's opinion* does not equate to underdevelopment of the record as to a claimant's disability, as 'the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians.'" *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quoting *Schmidt v. Astrue,* 496 F.3d 833, 845 (7th Cir. 2007)). As discussed, the ALJ found that Dr. Moyers' opinions were inconsistent with her treatment notes, with Skelton's activities of daily living and other evidence in the record. As a result, the ALJ was not required to defer to Dr. Moyers' opinion and substantial evidence supported the ALJ's findings.

C.  **Plaintiff Could Perform Other Work**

Finally, Skelton argues that the ALJ posed an improper hypothetical question to the vocational expert because it did not include limitations for absenteeism or an inability to sustain work-like procedures. (ECF No. 14 at 13-14). The Court, however, holds that the ALJ properly qualified the hypothetical to the vocational expert based upon Skelton's RFC, which included all of her credible limitations. (TR. 19, 56-57). *See Lacroix v. Barnhart,* 465 F.3d 881, 889 (8th Cir. 2006) (quotation and citation omitted) ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."). The vocational expert testified that an individual such as Skelton could perform the vast majority of unskilled light work. This hypothetical question included those limitations the ALJ found credible and excluded those that the ALJ discredited (as set forth in his and this opinion). The Court concludes that the ALJ properly found that Skelton could perform other work that exists in significant numbers in the national economy. (Tr. 18-19, 56-57). Therefore, the Court holds that the hypothetical question was proper and the vocational expert's answer constituted substantial evidence supporting the Commissioner's denial of benefits. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011).

VI.  **Conclusion**

Based on the foregoing, the Court finds that the ALJ's decision was based on substantial evidence in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that this action is **AFFIRMED**. A separate Judgment will accompany this Order.

Dated this 26th day of January, 2016.

*Ronnie L. White*
RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE